# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

J.V. and M.Q. on behalf
of their minor child C.V.,

       Plaintiffs,

v.                               Civ. No.12-0046 MV/CG

XIOMARA D. SANCHEZ, an
Albuquerque Public Schools
School Resource Officer,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Xiomara Sanchez's Motion for Summary Judgment on the Grounds of Qualified Immunity [Doc. 33].   The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that Defendant's Motion is well-taken and will be granted.

## BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Plaintiffs]" as the party opposing the summary judgment, are as follows.[1]   *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662 (10th Cir. 2010).   During the relevant time period, Defendant Xiomara Sanchez was on duty as an APS Police Officer.   Doc. 33-1, ¶ 3.   C.V. was a seven-year-old special education student at Mary Ann Binford Elementary (the "School").   Doc. 33 at 2; Doc. 39 at 3.

---

[1] In their response in opposition to Defendant's motion, Plaintiffs state that they dispute the majority of the facts as set forth in Defendant's statement of undisputed facts.   A careful reading of Plaintiffs' response, however, makes clear that Plaintiffs do not offer conflicting evidence that creates a dispute of material fact, but rather offer supplemental facts, characterizations of the facts presented in Defendant's motion, and conclusions they seek the Court to draw from the facts.   To the extent that there is a dispute as to material facts, the Court has construed those facts in the light most favorable to Plaintiffs.   Further, the Court has included in its statement of the facts the supplemental facts presented by Plaintiffs, to the extent those facts are relevant.

Maria Martinez, a social worker employed by the Albuquerque Public Schools Board of Education, was working at the School.   She had been C.V.'s social worker for two years.   Doc. 39 at 3.   C.V. was a student in the classroom of teacher Paula Gutshall and educational assistant Ms. Trujillo.   Doc. 33-1, ¶¶ 4-5.

C.V. was eligible for special educational services for being "autistic" and "gifted."   Doc. 39 at 3.   On November 22, 2010, a Behavior Intervention Plan ("BIP") was created for C.V. because of "persistent and/or severe behavior" that was "interfere[ing] with [his] learning or the learning of others and interventions [were] needed to positively redirect the targeted behavior."   Doc. 39-2.   Specifically, the BIP notes that it was developed because of "Inappropriate classroom behavior; physical contact; no remorse when safety is a concern (hitting, kicking, biting, pulling, pushing, lying)."   *Id.*   The BIP includes a "Crisis Plan," which indicates that "an emergency situation or behavior crisis [will] be handled" as follows:   "1.) Severity of physical contact, parent notified; 2.) Crisis Team called."   *Id.*   The BIP does not specify who is on the "Crisis Team." *Id.*   The BIP does not address the issue of physical restraint.

At approximately 10:30 a.m. on November 14, 2011, Trujillo told Martinez that C.V. was calling his peers "stupid" and was refusing to do his classwork.   Doc. 33-1, ¶ 5; Doc. 41-8.   With some encouragement, C.V. agreed to go with Martinez to her office next door.   Doc. 33-1, ¶ 6; Doc. 41-8.   C.V. then took off his shoes and threw them at Martinez.   Doc. 41-8.   She picked up his shoes and asked him to put them back on.   *Id.*   He refused, and started to crawl all over Martinez's room, grabbing things to throw at her.   *Id.*   At that point, Martinez decided to seek help from the School office.   *Id.*   The Assistant Principal, Misti Miller, attempted to take charge of C.V., and Martinez proceeded to the office to speak with the School Principal.   *Id.*

The Principal instructed Martinez to call C.V.'s parents to ask them to come to the School

2

to help control C.V.   *Id.*   Martinez was unable to reach either C.V.'s mother or father, and left

messages.   *Id.*   Although she was able to reach C.V.'s grandmother, the grandmother indicated

that she lived too far away to come, as she would be unable to arrive at the School before 2:00 p.m.

*Id.*   Eventually, Martinez reached C.V.'s father, but he refused to come to the School.   Doc. 33-1,

Ex. 2 ¶ 8.

Meanwhile, when C.V. saw the Assistant Principal, he took off running.   Doc. 33-1, Ex. 1

¶ 7.   Martinez and Miller were concerned that C.V. would run off campus, based on past

experiences with C.V. as "a runner."   *Id.* ¶ 8; Doc. 41-8.   They found him and brought him back

to the office, but he ran away from them several times.   Doc. 41-8.   While in the office, he took

off his shoes and threw them at the Principal.   *Id.*   C.V. ran around the inside of the School

building, at one point running into the School nurse's office, where he locked himself in a

bathroom.   Doc. 33-1, Ex. 2 ¶ 8.   At another point, he ran into the cafeteria.   *Id.* ¶ 9.

Martinez followed C.V. into the cafeteria and asked if he was hungry.   Doc. 41-8.   He ran

away from her, hid under the tables and started eating food off of the floor.   *Id.*   Martinez got him

a tray, and he ate a fresh roll and drank some milk.   *Id.*   Martinez asked him to put on his shoes

and come with her to her room.   *Id.*   He agreed, and they walked toward the door.   *Id.*

Sanchez had been dispatched to the School at 12:15 p.m. regarding a report that a child was

out of control.   Doc. 33-1, Ex. 3 ¶ 4.   The record does not indicate who called APS and made this

report, but the logical inference is that it was someone in the School administration.   When she

first arrived at the School, Sanchez met with the Principal and Assistant Principal, who informed

her that C.V., a student at the School, had been running around the School and causing problems

since approximately 10:30 a.m.   *Id.* ¶ 5.   They further informed her that C.V.'s parents had been

asked to come to the School, but that they had refused.   *Id.* ¶ 6.   There is no evidence in the record

3

that the Principal, Assistant Principal, or any other School administrator informed Sanchez that C.V. was a special education student, or that he had a BIP in place.

The Principal escorted Sanchez to the cafeteria.   *Id.* ¶ 7.   At the same time they were entering the cafeteria, Martinez and C.V. were exiting the cafeteria.   Doc. 41-8.   When C.V. saw the Principal and Sanchez, he took off running again around the School.   *Id.*

At that point, Sanchez went to the School office to call C.V.'s parents.   Doc. 33-1, Ex. 3 ¶ 7.   She first spoke with C.V.'s father, who refused to come to the School until after 2:30 p.m, as he was at the airport.   *Id.* ¶ 8.   He told Sanchez to call C.V.'s mother.   *Id.*   Sanchez then called C.V.'s mother.   *Id.* ¶ 9.   Sanchez identified herself as "school security," and informed C.V.'s mother that, because C.V.'s behavior was out of control, she needed to come pick him up from School.   Doc. 39-1, ¶ 14.   C.V.'s mother advised that she would come, but that it would take approximately 30 minutes, as she also needed to pick up her younger son from preschool.   *Id.* ¶ 15.   Sanchez asked C.V.'s mother for permission to restrain him.   *Id.* ¶ 16.   C.V.'s mother responded, "Yes."   *Id.*

C.V.'s mother did not understand that Sanchez was seeking permission to handcuff C.V. *Id.*   Rather, she thought that a trained member of C.V.'s behavioral intervention team would hug or hold him with his or her body to calm him down.   *Id.*   There is no evidence in the record that C.V.'s mother asked Sanchez to explain what she meant by "restrain."

After approximately 15 minutes of chasing C.V., School staff, including Martinez, coaxed C.V. into Room 127.   Doc. 41-8.   Sanchez met them in Room 127.   Doc. 33-1, Ex. 3 ¶ 13.   C.V ran around the room, touching everything.   Doc. 41-8.   He started pulling on a computer; Martinez went to move him away.   *Id.*   C.V. then started kicking, swinging his arms and trying to hit anybody and anything.   *Id.*   He kicked and knocked over the trash can and chairs, and crawled

4

under a glass desk.   *Id.*   There he pulled electrical plugs out of the wall, and turned the power strip on and off repeatedly.   *Id.*   He lay on his back and kicked Martinez with his legs and swung his arms as if trying to hit anyone.   *Id.*   He crawled over and hit another School employee, Gina Herbert, with a three-prong plug.   *Id.*

Sanchez was blocking the door so as to prevent C.V. from running out of the room.   Doc. 33-1, Ex. 3 ¶ 13.   C.V. went toward her, pushing at her to move away from the door.   Doc. 41-8. Sanchez told him to stop.   *Id.*   C.V. then started to kick and hit her.   *Id.*   Sanchez warned him that if he did not stop, she would place him in handcuffs.   *Id.*; Doc. 33-1, Ex. 3 ¶ 20.   C.V. sat on the floor and continued kicking.   Doc. 41-8.   He then found a rubber band and stretched it toward Sanchez's face.   *Id.*   Sanchez warned him not to shoot the rubber band at her.   *Id.*   C.V. tried, unsuccessfully, three times to hit her with the rubber band; the fourth time he hit her.   *Id.* Sanchez again warned that if he did not stop, she would put him in handcuffs.   *Id.*   C.V. continued to shoot the rubber bands at Sanchez and kick her.   *Id.*; Doc. 33, Ex. 3 ¶ 21.   At 1:04 p.m., approximately 15 minutes after she first began observing C.V.'s behavior, Sanchez escorted C.V. to a chair, and handcuffed him to the chair.   Doc. 41-8; Doc. 33-1, Ex. 3, ¶ 30.   Specifically, she put one of his arms over the chair back, and placed the other behind his back through the opening between the seat and the chair back.   Doc. 41-6.   Sanchez double locked the handcuffs to prevent them from tightening.   Doc. 33-1, Ex. 3. ¶ 23.   She ensured that there was a thumb-width of space, or approximately one-inch, between the handcuffs and C.V.'s wrist.   *Id.*

C.V. pleaded with Sanchez, "take them off, take them off."   Doc. 41-8.   Sanchez told him that she would take them off when he calmed down and stopped kicking.   *Id.*   C.V. stood up in the chair several times, dragging the chair with him, pulling, tugging and twisting.   *Id.*; Doc. 33, Ex. 3 ¶ 25.

Officer Villonez arrived.   Doc. 41-8.   He saw C.V. struggling and kicking, and, in a commanding tone, yelled at him to stop.   *Id.*   C.V. stopped struggling, stared at Villonez, sat down, and started crying.   *Id.*   Within minutes after C.V. sat down, at 1:22 p.m, C.V.'s mother entered the room.   *Id.*; Doc. 33, Ex. 3 ¶ 27.

C.V.'s mother demanded that Sanchez remove the handcuffs.   Doc. 39-1, ¶ 22.   She took out her cell phone and started taking photographs.   *Id.*   Sanchez removed the handcuffs.   *Id.*   At that point, C.V. had been in the handcuffs for approximately 15 minutes.   Doc. 33, Ex. 3 ¶ 29.   There were welts and scratches on C.V.'s wrists where the handcuffs had cut into him as he struggled, and his face and eyes made apparent that he had been crying.   Doc. 39-1, ¶ 20.

C.V.'s mother asked whether anyone at the School had told Sanchez that C.V. was in special education and was autistic.   *Id.* ¶ 24.   Sanchez responded, "No."   *Id.*   On their way out, C.V.'s mother withdrew him from the School effective immediately.   *Id.* ¶ 28.

On January 17, 2012, C.V.'s parents, on behalf of C.V., commenced this action against Sanchez.   In their one-count Complaint for Recovery of Damages Due to Deprivation of Civil Rights, Plaintiffs allege Fourth Amendment violations of unlawful arrest, excessive force, and unlawful seizure.   Doc. 1-1.   On June 30, 2012, Defendant filed the instant motion for summary judgment on the basis of qualified immunity, arguing that there is no clearly established law that makes Sanchez's actions unlawful.   Doc. 33.   Plaintiffs filed a response in opposition on July 19, 2012, and Defendant's reply followed on August 2, 2012.   Doc. 46.

## **DISCUSSION**

I.   <u>Qualified Immunity Principles</u>

Defendant seeks summary judgment on the basis of qualified immunity as to Plaintiffs' Fourth Amendment claims of unlawful seizure, excessive force and unlawful arrest.   The

affirmative defense of qualified immunity arose to address the fact that, "[a]lthough actions for damages provide an important remedy for individuals injured by governmental officials' abuse of authority, such actions sometimes subject officials to costly and harassing litigation and potentially inhibit officials in performing their official duties." *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001). To balance these competing interests, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation omitted). Qualified immunity affords "broad protection, . . . giving officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery." *Id.* (citation omitted). Thus, "courts should resolve the purely legal question raised by a qualified immunity defense at the earliest possible stage in litigation." *Id.* (citation omitted).

In keeping with the purposes of qualified immunity, "special rules apply when an official raises a defense of qualified immunity on summary judgment." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993). Specifically, "qualified immunity requires a two-step sequence." *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. Feb. 27, 2012) (citation omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citation omitted). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross*, 245 F.3d at 1156. The Court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). Although the Court views the evidence in the light most favorable to the nonmoving party, "the record must clearly demonstrate the plaintiff has satisfied his heavy

two-part burden; otherwise, the defendants are entitled to qualified immunity."   *Gross*, 245 F.3d at 1156.

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that [her] actions violate that right."   *Lundstrom*, 616 F.3d at 1118-19 (citation omitted).   "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Fisher v. City of Las Cruces*, 584 F.3d 888, 900 (10th Cir. 2009) (citation omitted).   Accordingly, a "plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it."   *Lundstrom*, 616 F.3d at 1119.   Specifically, a "plaintiff must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue."   *Id.*

This does not mean that the plaintiff must "present a case with an identical factual situation."   *Id.*   To the contrary, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."   *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).   The "salient question" thus is whether the state of the law at the time of the alleged misconduct gave the defendant "fair warning" that her alleged misconduct was unconstitutional.   *Id.*   In order to answer this question, the Court looks to "Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains."   *Lundstrom*, 616 F.3d at 1119.

II.   <u>Plaintiffs' Fourth Amendment Claims</u>

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const., Amend, IV.   The Fourth Amendment applies "within the school setting,

and it is not limited to actions taken for law enforcement purposes."   *Couture v. Board of Educ. of Albuquerque Pub. Schs.*, 535 F.3d 1243, 1250 (10th Cir. 2008).

Plaintiffs' Complaint includes one count, alleging multiple Fourth Amendment violations. Specifically, Plaintiffs allege that by handcuffing C.V., Sanchez subjected him to "an unreasonable search and seizure"; unlawfully arrested him without "probable cause"; and used force that was "objectively unreasonable."   Doc. 1-1 ¶¶ 50, 52, 54.   Although Plaintiffs appear to be asserting claims both of unlawful seizure and unlawful arrest, there is no evidence that C.V. was seized, and separately, arrested.   Rather, there is only one incident alleged here – C.V.'s handcuffing – that gives rise to Plaintiffs' claims.   While, as set forth herein, the evidence demonstrates that C.V. was seized in an effort to control his behavior, there is no evidence that C.V. was suspected of, or arrested for, committing a crime.   Also as set forth herein, the Court determines that the probable cause standard, applicable to warrantless arrests, does not apply to C.V.'s handcuffing.   Accordingly, the Court interprets the Complaint to allege two Fourth Amendment violations:   unlawful seizure and excessive force.   To the extent that Plaintiffs intended to allege a constitutional violation based on unlawful arrest, because that claim is unsupported both by the law and the evidence, that claim will be dismissed.

"[I]n a cases involving claims of both unlawful detention and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the detention and the degree of force they used to effect it."   *Cortez v. McCauley*, 478 F.3d 1108, 1127 n.23 (10th Cir. 2007).   These two inquiries – whether the detention was reasonable and whether the officers used greater force than would have been reasonably necessary to effect a lawful detention – are separate and independent, though the evidence may overlap."   *Id.*

A.    Unlawful Seizure Claim

The first step in the Court's analysis ordinarily is to determine whether there was a seizure under the Fourth Amendment.   *Couture*, 535 F.3d at 1250.   "A seizure occurs when a reasonable person would have believed that he was not free to leave."   *Id.* (citation omitted).   The Court views the alleged seizure through the eyes of a reasonable person of the age and circumstances of the person subject to the alleged seizure.   *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005). Without question, a reasonable person in C.V.'s position would not have believed that he was free to leave once he was handcuffed.   Indeed, Defendant does not dispute that C.V. was seized, for purposes of the Fourth Amendment, when Sanchez handcuffed him.

Next, the Court must determine whether the seizure was reasonable.   "[T]he setting and the purpose of actions undertaken outside the typical law enforcement context profoundly affect their reasonableness."   *Couture*, 535 F.3d at 1250.   In *New Jersey v. T.L.O.*, the Supreme Court recognized, in the context of the detention and questioning by school officials of a child for the purpose of maintaining or restoring order in the school, an exception to the rule that a search or seizure requires either a warrant or probable cause.   469 U.S. 325, 341 (1985).   The Supreme Court concluded that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause."   *Id.* Rather, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search."   *Id.*   Adopting the *Terry* standard, which governs the reasonableness of investigatory stops, the Court explained that a search of a student by a school official is reasonable if "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place."   *Id.* (quoting *Terry v. Ohio*, 392

10

U.S. 1, 20 (1968)).

The Tenth Circuit has held that "the same considerations which moved the Supreme Court to apply a relaxed Fourth Amendment standard in cases involving school searches support applying the same standard in school seizure cases."  *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989).   Thus, the Tenth Circuit has "held since 1989 that seizures of students by school officials must pass the *Terry* test."  *Jones v. Hunt*, 410 F.3d 1221 (10th Cir. 2005).

Defendant argues that the *T.L.O.* standard should be applied to determine whether her seizure of C.V. was reasonable under the Fourth Amendment.   Plaintiffs disagree, and contend that because the seizure was conducted by a police officer, rather than by a school official, the proper standard is the one governing police-initiated seizures generally:   the probable cause standard.[2]

The Supreme Court in *T.L.O.* left open the question of "the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies."   469 U.S. at 341 n.7.   Albeit in a case involving a seizure by school officials, the Tenth Circuit stated that "[t]he requirement that *police* have probable cause before conducting a seizure . . . does not apply to schools;" rather, the reasonableness standard set forth in *T.L.O.* applies.   *Couture*, 535 F.3d at 1250 (emphasis added).   Other courts have specifically held that the *T.L.O.* reasonableness standard applies where a seizure is conducted at a school by a police officer acting as a "school resource officer" for the purpose of maintaining

---

[2] While Plaintiffs assert that the probable cause standard applies here, they do not articulate that standard, or apply it to the fact of the case.   To the contrary, they appear to attempt to apply the standard applicable to determining whether, in the first instance, a seizure was effected (an issue not in dispute here) to the Court's determination of whether the seizure is reasonable.   *See* Doc. 39 at 9-10.   Further, to the extent that the Court is able to ascertain which allegations relate to which Fourth Amendment violation asserted by Plaintiffs in their one-count Complaint, Plaintiffs appear to be stating their unlawful seizure claim in terms of the reasonableness inquiry articulated in *T.L.O.*   *See* Doc. 1-1, ¶¶ 48-49 ("Defendant Sanchez's intrusion on C.V.'s bodily integrity was not justified at its inception. Defendant's arrest of C.V. was not reasonably related to the circumstances that gave rise to it.").

school order or security.   *See Gray v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) (applying

reasonableness standard articulated in *T.L.O.* to seizure by deputy sheriff serving as a school

resource officer who handcuffed student he had witnessed engaging in disruptive behavior), *cert.*

*denied*, 550 U.S. 956 (2007); *Shade v. City of Farmington*, 309 F.3d 1054, 1061 (8th Cir. 2002)

(applying *T.L.O.*'s two-part inquiry to seizure by police officers who served as school "liaison"

officers, where they initiated investigation and search of student in furtherance of school's interest

in maintaining a safe learning environment, and because school officials asked the officers to assist

them in furtherance of that interest); *EC v. County of Suffolk*, 882 F. Supp. 2d 323, 356 (E.D.N.Y.

2012) (applying *T.L.O.* standard to seizure by police officer serving as school resource officer who

handcuffed student whose behavior was out of control), *aff'd*, __ F. App'x. __, 2013 WL 978953

(2d Cir. 2013); *see also Reynolds v. City of Anchorage*, 379 F.3d 358, 372 (6th Cir. 2004) (noting

that courts generally have applied the *T.L.O.* standard "where a police officer is employed by the

school or school district and the search is consonant with the 'special needs' of school discipline").

The sole case cited by Plaintiffs in support of their position does not hold to the contrary.

In *Pacheco v. Hopmeier*, a New Mexico state police officer came to a high school, and told the

principal that the plaintiff was a potential witness to a crime committed by another, and that the

police wanted to take him to the police station for questioning.   770 F. Supp. 2d 1174, 1182

(D.N.M. 2011).   Acting on this request, the principal assisted the police in executing the seizure.

*Id.*   Although first acknowledging the weight of authority applying the *T.L.O.* reasonableness

standard to cases where seizures were initiated by police officers to maintain school order or

security, the Court declined to apply that standard to the facts before it, as the police officer had

initiated a seizure on school grounds for a reason *other than* maintaining school security.   *Id.* at

1183.

In the instant case, School officials summoned Sanchez, the school resource officer assigned to the School, to assist them with what they reported to be a situation involving a student who was out of control.   Upon her arrival, the Principal and Assistant Principal told Sanchez that C.V. had been running around the School and causing problems for one hour and 45 minutes. Sanchez's seizure of C.V. thus was conducted for the very reason of maintaining school order and security.   As her actions were in furtherance of the School's "special need" for discipline and maintenance of a safe learning environment, the *T.L.O.* reasonableness standard is applicable. Under this standard, Sanchez's seizure of C.V. was lawful only if it was justified at its inception and reasonably related in scope to the circumstances which justified the interference in the first place.   *T.L.O.*, 469 U.S. at 341.

The Court need not reach this constitutional question, however, as "prior case law has not clearly settled the right [at issue here], and so given officials fair notice of it."   *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011).[3]   In other words, in light of pre-existing law, a reasonable officer in Sanchez's position would not have known that handcuffing C.V., under the circumstances presented to her, violated C.V.'s Fourth Amendment right to be free from unreasonable seizure.

Sanchez's seizure of C.V. arose directly from the School's request for police assistance with a child who the School reported to be "out of control."   Upon arrival at the School, School officials informed Sanchez that C.V. had been running around the School and causing problems for approximately one hour and 45 minutes.   They further informed her that C.V.'s parents

---

[3] Indeed, as the Supreme Court noted, the Court's "usual adjudicatory rules suggest that a court *should* forebear resolving this issue.   After all, a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."   *Camretta*, 131 S. Ct. at 2031 (emphasis in original).

refused to come to the School to help control their son.   No one at any time told Sanchez that C.V. was a special needs student, or that he had a BIP in place.

Sanchez's first observation of C.V. was to see him run out of the cafeteria and around the School.   It took 15 minutes for School employees to coax C.V. into a room where he could be contained.   Sanchez herself attempted to seek assistance from C.V.'s parents, a step which, notably, is identified in his BIP as the first step to be taken in a "behavior crisis."   Neither of C.V.'s parents, however, was able or willing to come promptly to assist in calming down their son.

Sanchez specifically asked C.V.'s mother for permission to restrain C.V.   C.V.'s mother responded, "Yes."   Accordingly, Sanchez believed that she was acting with C.V.'s mother's consent in handcuffing C.V.   This belief was reasonable under the circumstances.

The fact that C.V.'s mother did not understand that Sanchez was seeking permission to handcuff C.V., but rather thought that a trained member of C.V.'s behavioral intervention team would hug or hold him with his or her body to calm him down, does not change this analysis. C.V.'s mother did not ask for clarification as to what Sanchez meant by "restrain," and it was reasonable for Sanchez, who had identified herself not as an educator but as "school security," to believe that C.V.'s mother had given her permission to handcuff C.V.   Further, Sanchez, who had not been told of C.V.'s BIP plan, could not reasonably have been expected to know that C.V.'s mother would assume that "restrain" meant hug or hold.[4]

Even after receiving C.V.'s mother's consent, Sanchez did not immediately handcuff C.V. Rather, she observed his behavior for another 15 minutes, during which time she, along with

---

4  There is actually no mention of restraint in C.V.'s BIP.   Nothing in the BIP directs that C.V. be hugged or held as a means of control, or forbids the use of handcuffs.   The BIP does indicate that the second step to be taken in a "behavior crisis" is to call the "Crisis Team."   The term "Crisis Team" is not defined.

School employees, tried, to no avail, to calm him down.   During that 15-minute period, Sanchez

observed C.V. pulling on a computer, kicking and hitting people, pulling electrical plugs out of the

wall, turning a power strip off and on repeatedly, and shooting rubber bands.   After warning him

more than once to stop his behavior, Sanchez ultimately handcuffed C.V. to a chair.

     After putting him in handcuffs, C.V. still did not calm down.   He stood up several times,

dragging the chair with him, pulling, tugging, and twisting.   In response to his pleas that she

remove the handcuffs, Sanchez told C.V that she would take them off as soon has he calmed down

and stopped kicking.   C.V. was in handcuffs for approximately 15 minutes.   Ultimately, C.V.

calmed down, and was sitting in the chair, crying, for only minutes when his mother entered the

room and demanded that the handcuffs be removed.   At that point, Sanchez removed the

handcuffs.

     The contours of the right of a child to be free from unreasonable seizure were not

sufficiently clear that a reasonable official in Sanchez's position would understand that her actions

in handcuffing C.V. violated that right.   Notably, Plaintiffs have not cited to, and this Court has

not found, any case in which the Tenth Circuit, or any other court, has held that the handcuffing of

a young student is *per se* unconstitutional.   To be sure, courts have found that, under the specific

facts before it, the handcuffing of a student constituted an unreasonable seizure.   In those cases,

however, the court's decision turned on the fact that, at the time of the seizure, the child was

completely compliant, and was not exhibiting any out of control, disruptive, or uncooperative

behavior.

     For example, in *Gray*, a police officer, acting as a school resource officer, handcuffed a

nine-year-old girl after witnessing her telling her gym teacher that she would punch or hit him in

the face.   458 F.3d at 1300.   She made the comment as she was walking over to the wall of the

15

gym, on the teacher's instruction, after she had refused to comply with his directive to do her exercises with the rest of the class.   *Id.*   The Eleventh Circuit found the handcuffing to be unreasonable under the circumstances, as "the incident was over," and the student "had promptly complied with her teacher's instructions."   *Id.* at 1306.   There was "no evidence that [the girl] was gesturing or engaging in any further disruptive behavior.   Rather, [she] had cooperated with her teachers and did not pose a threat to anyone's safety."   *Id.*   Because the officer admitted that he did not handcuff the child to protect him or anyone's safety, the Court found that, "[i]n effect, [the officer's] handcuffing of [the child] was his attempt to punish [her] in order to change her behavior in the future."   *Id.*   The Court concluded that the officer's conduct "was an obvious violation of [the student's] Fourth Amendment rights.'   *Id.*

In a subsequent opinion in the *Gray* case, the Eleventh Circuit clarified that "[t]he substantive point of law underlying the plaintiff's victory . . . [was] the fairly narrow one that a law enforcement officer, acting as a school resource officer, who handcuffs a compliant nine-year-old child for purely punitive purposes has unreasonably seized the child in violation of the Fourth Amendment."   *Gray v. Bostic (Gray II)*, 625 F.3d 692, 694 (11th Cir. 2010).   In reaching its decision, the Court emphasized that it was "not saying that the use of handcuffs during an investigatory stop of a nine-year-old child is always unreasonable, but just unreasonable under the particular facts of this case."   *Gray*, 458 F.3d at 1307.   District courts have similarly found handcuffing a student to be unreasonable under the *T.L.O.* standard where the student exhibited only passive disobedience.   *See C.B. v. Sonora Sch. Dist.*, No. 09-cv-285, 2011 WL 532404 (E.D. Cal. 2011) (handcuffing of "passive, compliant eleven-year-old child" held to be unreasonable where, although "verbally unresponsive," the child nonetheless complied with the officers' order to stand, and the officers had no reason to believe that he would not continue to comply with their

directives); *Ilias v. Johnson*, No. 07-513, 2008 WL 4838846, *5 (D. Or. Nov. 4, 2008) (officers'
handcuffing of student who did not comply with teacher's order to sit down during detention held
to be unreasonable where student had returned to detention room "amicably," and was handcuffed
and forced into chair for doing "nothing more than passively refusing to follow [the teacher's]
order that she sit while in the detention room").

Also in the school context, in *Doe v. v. State of Hawaii Dep't of Educ.*, the Court found that
it was objectively unreasonable for the vice principal to seize a second-grade student by taping his
head to a tree.   334 F.3d 906, 908 (9th Cir. 2003).   The student's teacher had sent him to the vice
principal to be disciplined for fighting, but the student then refused to stand still against a wall for
his timeout punishment.   *Id*.   The vice principal took the child outside and used masking tape to
tape his head to a tree.   *Id.*   The vice principal did not remove the tape until a fifth-grade girl told
him that she did not think he should be doing that.   *Id.*   In finding sufficient evidence for a fact
finder to conclude that the vice principal's conduct was objectively unreasonable in violation of
the Fourth Amendment, the Court explained that, "[a]t the time that [the vice principal] taped him
to the tree, [the child's] only offense had been 'horsing around' and refusing to stand still.   There
was no evidence that [the child] was fighting or that he posed a danger to other students."   *Id.* at
909.   Thus, essential to the Court's determination was the fact that the student's misbehavior
amounted to no more than a passive refusal to stand against a wall; his behavior was not disruptive,
violent, or out of control at the time that he was seized.

In contrast, where a student *was* exhibiting disruptive behavior, the court has found the
officer's actions in handcuffing the student to be reasonable.   In *EC*, a police officer, acting as a
school resource officer, arrived at a school parking lot to find two school security guards
struggling to restrain an eleven-year-old student with special needs on the ground in the

17

playground area.   882 F. Supp. 2d at 336.   The officer asked if the guards needed help, and they

responded that the child was "out of control" and was attempting to hurt himself or other people.

*Id.*   The officer observed the child "kicking his feet, flailing his arms, yelling and trying to head

butt and bite people."   *Id.*   After trying for five to seven minutes to calm the child down, the

officer told the child that he was going to put him in handcuffs, and told him to put his hands

behind his back.   *Id.*   The child screamed and cried, "Take them off.   Get them off of me."   *Id.*

He continued to head butt, kick his feet and yell, and said that "his bones hurt."   *Id*.   Shortly after

the officer handcuffed the child, the child's mother arrived; when she saw that he was handcuffed,

she became upset and asked that the handcuffs be removed.   *Id.* at 337.   At that point, the officer

removed the handcuffs.   *Id.*   The Court found that, under the circumstances, the handcuffing was

justified at its inception and reasonable in its scope.   *Id.* at 356.   The Court noted that, under the

facts, there was no "reasonable alternative to [the officer's] limited handcuffing of [the child]."

*Id.*; *see also Couture*, 535 F.3d at 1251-56 (finding that School's repeated placement of

six-year-old student with behavioral problems in small timeout room, sometimes by use of force

and for prolonged periods of time, was not unreasonable); *Samuels v. Indep. Sch. Dist. 279*, No.

02-474, 2003 WL 23109698 (D. Minn. Dec. 8, 2003) (finding that school liaison officer's

handcuffing of student based on request by administrative assistant, coupled with officer's own

assessment of situation and observation of student's "tense and angry" demeanor, was not

unreasonable).

        In the instant case, Sanchez was not faced with a "passive, compliant" child at the time of

the handcuffing.   Rather, at the time she handcuffed C.V., Sanchez had personally observed

C.V.'s disruptive and uncooperative behavior for at least 15 minutes.   C.V. specifically refused to

heed Sanchez's several warnings to stop kicking and trying to hit her with rubber bands.   Nor was

C.V. passive and compliant after he was placed in handcuffs; rather, while yelling for the handcuffs to be removed, C.V. continued his disruptive and uncooperative behavior.   Within minutes after he became compliant, Sanchez removed the handcuffs.   Accordingly, Sanchez was confronted with circumstances materially different from those present in the cases where the Court found an officer's handcuffing of a student to be unreasonable.   Like the officer in *EC*, Sanchez was confronted with a child whose behavior was out of control, and could not be controlled by herself or School staff by any reasonable alternative measures.   Given the state of the law, Sanchez thus did not have fair warning that handcuffing C.V. was an unreasonable seizure for Fourth Amendment purposes.

Plaintiffs argue that it was clearly established, at the time of the incident, that Sanchez's handcuffing of C.V violated his Fourth Amendment right to be free from unreasonable seizure because the handcuffing violated several New Mexico statutory provisions and Albuquerque Public School Police Department procedures.   *See* Doc. 39 at 11-12; 16-17; 19-21; 23-24. Plaintiffs' reliance on state law and school or police procedures, however, is misplaced.   "[T]he Supreme Court has made clear that officials 'do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."   *Couture*, 535 F.3d at 1255 (quoting *Davis v. Scherer*, 468 U.S. 183, 194-96 (1984)).   Accordingly, neither claims based on violations of state law nor claims based on police procedure are actionable under Section 1983. *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001); *see also Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1174 (10th Cir. 2003) ("[V]iolations of state law by state officials in the course of state law enforcement activities do not create actionable Fourth Amendment claims."); *Jones v. City & County of Denver, Colo.*, 854 F.2d 1206 (10th Cir. 1988) ("Section 1983 . . . does not provide a basis for redressing violations of *state* law, but only for those violations of

19

federal law done under color of state law.") (emphasis in original); *Wilson v. Meeks*, 52 F.3d 1547

(10th Cir. 1995) (A "violation of a police department regulation is insufficient for liability under

section 1983").   As the Tenth Circuit explained in *Couture*:

> The Constitution establishes certain minimum thresholds for official conduct.   It is
> to be expected – and hoped – that states, school boards, police departments and
> other agencies will go beyond constitutional minima in determining the standards
> and policies to which their employees must conform.   If federal courts were to
> regard such standards as setting the boundaries for reasonableness under the Fourth
> Amendment and thus for purposes of imposing monetary liability on local officials
> and agencies, it would create a disincentive for the promulgation of rigorous
> standards, and would place interpretation and enforcement of those standards into
> the hands of federal judges.

535 F.3d at 1255.   Accordingly, state statutes and school or police rules and regulations in force at

the time of the alleged incident are inapposite to the Fourth Amendment issues before the Court.

Plaintiffs also argue that Sanchez's handcuffing of C.V. violated his clearly established

right to adequate regard for his medical needs.   Doc. 39 at 13-15.[5]   According to Plaintiffs,

C.V.'s behavioral issues were "in actuality a serious medical episode," to which Sanchez was

deliberately indifferent.   *Id.* at 15.   Under the Fourteenth Amendment, pretrial detainees are

entitled to adequate medical attention.   *Martin v. Board of County Comm'rs of County of Pueblo*,

909 F.2d 402, 406 (10th Cir. 1990).   Deliberate indifference to a known medical need in violation

of the Fourteenth Amendment can form the basis of a Section 1983 action.   *Howard v. Dickerson*,

34 F.3d 978, 980-81 (10th Cir. 1994).

---

5 Plaintiffs set forth their argument regarding C.V.'s right to adequate regard for his medical needs in a section
entitled, "Community Caretaking Duty to Respond to Medical Emergency."   Doc. 39 at 12.   Plaintiffs seem to
misunderstand the concept of the community caretaking function of police officers.   The Tenth Circuit has
"recognized that, in fulfilling their duties, police officers may exercise functions – 'community caretaking functions '
– wholly separate and apart from detecting, investigating, or acquiring evidence of a crime."   *Lundstrom*, 616 F.3d at
1120.   Under this doctrine, "[p]olice officers carrying out such functions may, in certain circumstances, properly
detain a person."   *Id.*   Such a detention "must be based upon specific and articulable facts which reasonably warrant
an intrusion into the individual's liberty."   *Id.*   If anything, the community caretaking function arguably might
provide an alternative basis for the Court to find that Sanchez is protected by qualified immunity for her actions in
detaining C.V.

Here, however, Plaintiffs have not alleged a violation of C.V.'s Fourteenth Amendment due process rights, on the basis of deliberate indifference to a known medical need or otherwise. Further, in the context of their Fourth Amendment claims, Plaintiffs do not allege that Sanchez was deliberately indifferent to C.V.'s "serious medical needs." *Martin*, 909 F.2d at 406.   Nor is there anything in the record to support Plaintiffs' newly raised contention.   Specifically, there is no evidence that C.V.'s status as a special needs student, due to being autistic and gifted, amounted to a "serious medical condition" that caused him to have a "serious medical episode."   And even if Plaintiffs could establish that C.V.'s special needs were a "serious medical condition," the undisputed evidence makes clear that Sanchez did not know, and could not have known without being told by the School, that C.V. was a special needs student with a behavioral plan in place. Accordingly, the due process right to adequate medical attention is simply not at issue in this case.

B.   <u>Excessive Force Claim</u>

A claim of excessive force is "governed by the Fourth Amendment's 'objective reasonableness' standard."   *Morris*, 672 F.3d at 1195 (citation omitted).   In analyzing an excessive force claim, the Court inquires as to "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."   *Graham v. Connor*, 490 U.S. 386, 397 (1989).   Accordingly, "[a]n officer's evil intention will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."   *Id.*

The Court judges the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."   *Id.* at 396. Accordingly, "[t]he calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.   "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case."  *Id.* at 396.

In the specific context of an excessive force claim based on handcuffing, the manner in which the officer effected the handcuffing informs the inquiry as to whether the force used was excessive.  *Fisher*, 584 F.3d at 893.   Under the relevant standard, Sanchez's handcuffing of C.V. constituted excessive force in violation of the Fourth Amendment only if Sanchez used greater force than would have been reasonably necessary to effect a lawful seizure.  *Cortez*, 478 F.3d at 1127.

For reasons similar to those set forth above in the context of Plaintiffs' unlawful seizure claim, the Court need not reach the constitutional question of whether Sanchez's handcuffing of C.V. constituted excessive force.  *See Camreta*, 131 S. Ct. at 2031.   Specifically, in light of pre-existing law, a reasonable officer in Sanchez's position would not have known that handcuffing C.V., under the circumstances presented to her, violated C.V.'s Fourth Amendment right to be free from the use of excessive force.

As described above, upon arrival at the School, Sanchez was informed that School employees had been unable to control C.V.'s behavior for approximately one hour and 45 minutes, and that C.V.'s parents had refused to come to the School to help control their son.   Sanchez was never advised of any of C.V.'s special needs, or that a special behavioral plan had been developed for C.V.   Sanchez herself observed C.V.'s out of control behavior, beginning with his running out of the cafeteria when he saw Sanchez approaching with the Principal.   It took 15 minutes for

22

School employees to coax C.V. into a room where he could be contained.

Sanchez did not immediately resort to the use of force.   Rather, she first attempted to seek assistance from C.V.'s parents.   Neither of C.V.'s parents, however, was willing or able immediately to come to the School to assist in calming down their son.   As explained above, Sanchez reasonably believed that C.V.'s mother consented to Sanchez's use of handcuffs on C.V.

Even after receiving C.V.'s mother's consent to restrain him, Sanchez did not immediately resort to the use of force.   Rather, she observed C.V.'s behavior for another 15 minutes, during which time C.V. was unresponsive to non-forceful efforts to calm him down.   After observing C.V.'s out of control behavior for a 15-minute period and warning him to stop his behavior, Sanchez handcuffed C.V. to a chair.

Sanchez double locked the handcuffs to prevent them from tightening, and ensured that there was approximately one inch between the handcuffs and C.V.'s wrists.   While he was handcuffed, C.V. made clear that he did not want to be handcuffed, and pleaded with Sanchez to remove the handcuffs.   He did not, however, indicate that the handcuffs were causing him any pain.   Although he received welts and scratches from the handcuffs, they were caused by his own struggling, and there is no evidence that they were severe enough to require medical attention. Sanchez told C.V. that she would remove the handcuffs as soon as C.V. stopped kicking and dragging the chair around the room.   Within minutes after he calmed down, Sanchez removed the handcuffs, at his mother's request.   C.V. was in handcuffs for approximately 15 minutes.

In light of these circumstances, the contours of the right of a student to be free from excessive force were not sufficiently clear that a reasonable official in Sanchez's position would understand that her actions in handcuffing C.V. violated that right.   Plaintiffs make the aspirational, though unsupported, statement that "[c]ases of excessive force against children

23

always fall in the class of cases where any thoughtful official would be on notice that their conduct violates established law even in novel factual circumstances."   Doc. 39 at 7.   The Court has found no legal authority to support this statement.   Rather, "[n]o case squarely governs the case here," and the Fourth Amendment cases "in the school context suggest that [Sanchez's] conduct fell into the 'hazy border between excessive and acceptable force.'"   *Hayenga v. NAMPA Sch. Dist. No. 131*, 123 F. App'x 783, 786, 2005 WL 375731 (9th Cir. 2005) (holding that, although officer used excessive force in taking a developmentally disabled student to the ground, handcuffing him, and, with the help of others, hobbling his legs and sending him to the hospital on a mental hold, as he continually complained of pain, officer was entitled to qualified immunity because the student's right to be free from the force used against him "was not clearly established at the time the incident occurred").

In one excessive force case in the school context, *Moretta v. Abbott*, the complaint alleged that two officers shot a six-year old student with a taser gun, causing 50,000 volts of electricity to enter his body and resulting in violent convulsions, vomiting, and permanent injury.   280 F. App'x 823, 824, 2008 WL 2229757 (11th Cir. 2008).   The officers handcuffed the child as he vomited.   *Id.*   The child had been removed from his classroom for discipline after having been disruptive in class, and while locked in the office, broke a picture frame in frustration.   *Id.*   The Court found that the complaint adequately alleged an excessive force claim.   *Id.* at 825.   In reaching that decision, the Court noted that when the officers arrived at the child's school, he was "standing motionless and passive in the corner of the assistant principal's office."   *Id.*   He "remained totally motionless and frightened while being confronted by the police officers."   *Id.* The Court found it reasonable to infer from the complaint that, "[f]rom the moment the police officers arrived on the scene, through the time the officers deployed a taser into [the child's] body

24

and handcuffed him, [the child] posed no threat to anyone's safety, including himself." *Id.*

In contrast, in *EC*, as described above, the officer arrived at the scene to find two school security guards struggling to restrain an "out of control" eleven-year-old student.   882 F. Supp. 2d at 336.   The Court found "simply no evidence" that the officer applied excessive force in handcuffing and restraining the student.   *Id.* at 357.   The Court explained:

> First, [the officer] avoided handcuffing [the child] until he was no longer able to restrain [him] by himself.   Secondly, the handcuffs were on for a relatively minimal amount of time and were removed immediately upon [the child's mother's] request, which coincided with her arrival at the playground and [the child's] gain of control over his emotions.   Next, plaintiffs themselves admitted that [the officer] did not punch, kick or cause any fractures to [the child].   They also admit that [the child] did not use any force against [the child] other than handcuffing and restraining him.

*Id.*

Here, as detailed above, C.V. was neither motionless nor passive when Sanchez handcuffed him, and his behavior reasonably posed a threat to his own safety, if not to the individuals trying to help him.   Moreover, the force used by Sanchez falls far short of the level of force used in tasering a child and then handcuffing him while he was vomiting, as the officers did in *Moretta*.   Further, Sanchez avoided handcuffing C.V. until she had exhausted other non-forceful measures; the handcuffs were on for no more than 15 minutes; Sanchez removed the handcuffs upon C.V.'s mother's request; and there is no evidence that the manner in which Sanchez handcuffed C.V. was excessively forceful.[6]   Given the state of the law, Sanchez did not have fair warning that handcuffing C.V. in the manner in which she did would constitute greater

---

[6] Plaintiffs argue that Sanchez's handcuffing of C.V. constituted excessive force because Sanchez's motivation was purely punitive:   she did it "to discipline him for not listening to her."   Doc. 39 at 11.   The law is clear, however, that this Court's analysis is limited to inquiring as to whether Sanchez's actions were objectively reasonable in light of the facts and circumstances confronting her, without regard to her underlying intent or motivation.   Accordingly, Sanchez's alleged motivation is irrelevant to the constitutional inquiry before the Court.   Nor does Plaintiffs' labeling of Sanchez's actions as "child abuse", *id.*, change the legal standard that governs their Fourth Amendment claims.

force than would have been reasonably necessary to effect a lawful seizure.

The excessive force cases cited by Plaintiffs, all of which involved incidents occurring in the course of a search or arrest in which the child was an innocent bystander, and most of which involved at least one officer pointing a gun at the child's head, do not change this analysis. Specifically, in *McDonald v. Haskins,* during a search of his family's residence, a police officer held a gun to the head of a nine-year-old child and threatened to pull the trigger.   966 F.2d 292, 292 (7th Cir. 1992).   The child "was not being arrested, nor was he even suspected of committing a crime," and posed no threat to the officer, other officers or the community.   *Id.* at 294.   The Seventh Circuit rejected the officer's argument that he was entitled to qualified immunity because it was not clearly established that his conduct constituted excessive force.   The Court concluded that "[i]t should have been obvious to [the officer] that his threat of deadly force – holding a gun to the head of a 9-year-old and threatening to pull the trigger – was objectively unreasonable given the alleged absence of any danger to [the officer] or other officers at the scene and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat."   *Id.* at 295; s*ee also Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) (holding evidence sufficient for reasonable jury to conclude officer used objectively unreasonable force in violently jerking a ten year old child out of her living room chair and dragging her into another room during course of her father's arrest, even though she was not under arrest and posed no threat to anyone.

Subsequently, in *Tekle v. United States*, a team of 23 agents went to an eleven-year-old child's home to arrest his father.   511 F.3d 839, 842 (9th Cir. 2007).   The child, barefoot and wearing only shorts and a t-shirt, happened to be exiting the garage at the time they arrived, and the officers ordered him to turn around and walk out of the garage with his hands up.   *Id.* at 843.   One of the officers held a gun to the child's head, searched him, and handcuffed him.   *Id.*   The officer

pulled him up from behind by the chain of the handcuffs and took him out to the sidewalk, where he sat, still handcuffed, with his feet in the street, until his father was brought out of the house in handcuffs, approximately 15 minutes later.   *Id.*   The officers then removed the handcuffs from the child and sat him on a stool in the driveway, where 15 to 20 officers kept their guns pointed at him.   *Id.*   Relying in part on *McDonald* and *Ikerd*, the Ninth Circuit concluded "that the officers had 'fair warning' that the force they used was constitutionally excessive even absent a Ninth Circuit case presenting the same set of facts."   *Id.* at 848 (citation omitted).   The Court further stated, "[a]lthough there may not be a prior case specifically prohibiting the use of handcuffs and weapons by more than twenty officers to subdue an unarmed eleven-year-old boy who is not suspected of any wrongdoing and is cooperating with the officers, *any* reasonable officer should have known that such conduct constituted the use of excessive force."   *Id.* (emphasis in original).

Finally, in *Holland v. Harrington*, during a search of a residence, a SWAT team pointed weapons at young children during their entry to the house.   268 F.3d 1179, 1192 (10th Cir. 2001). The Tenth Circuit found "no substantial grounds for a reasonable officer to conclude that there was legitimate justification for continuing to hold the young people outside the residence directly at gunpoint after they had completely submitted to the SWAT deputies' initial show of force, or for training a firearm directly upon a four-year-old child at any time during the operation."   *Id.* at 1197.   Accordingly, the leader of the SWAT team was not entitled to qualified immunity for alleged excessive use of force for holding the children at gunpoint.   *Id.*

In light of these cases, the law is clearly established that, in the context of a search of a residence, or the arrest of another individual, it is objectively unreasonable for an officer to hold an unthreatening child at gunpoint.   Accordingly, any reasonable officer would know that engaging in such conduct violates the right to be free from excessive force.   Nothing in these cases,

however, suggests that, in the school context, it is objectively unreasonable for an officer to handcuff a child whose behavior is "out of control."   Accordingly, these cases do not make it apparent that, in light of pre-existing law, any reasonable officer would know that handcuffing C.V., in the manner and under the circumstances in which Sanchez handcuffed him, would violate the right to be free from excessive force.

**CONCLUSION**

Without question, this case is one in which, "[w]ith the benefit of hindsight, one might have hoped for a different resolution."   *Mecham v. Frazier*, 500 F.3d 1200, 1205 (10th Cir. 2007). The use of handcuffs as a means of calming down her seven-year-old son was not what C.V's mother envisioned when she gave Sanchez permission to restrain her son.   Ideally, school officials should have in place disciplinary procedures sufficient to manage their elementary school students, without summoning law enforcement.   Even if the need for police intervention arises, ideally, officers specifically designated to assist our public schools should be trained in effective and non-punitive disciplinary techniques.   And it should go without saying that school officials should provide the officers whom they summon with the information those officers need – including information regarding students' special needs and individualized behavior plans – to properly assess the situation before them and make decisions that do not traumatize the children whose safety they are there to protect.

The Court's role in this matter, however, is not to implement ideals in the public schools, but rather to determine the limited issue of whether it was clearly established that Sanchez's actions, under the circumstances presented to her, violated the Fourth Amendment.   The Court cannot conclude that the clearly established law put Sanchez on notice that her actions violated C.V.'s Fourth Amendment rights to be free from unlawful seizure and excessive force.   Sanchez

thus is entitled to qualified immunity on Plaintiffs' Fourth Amendment claims.

**IT IS THEREFORE ORDERED** that Defendant Xiomara Sanchez's Motion for

Summary Judgment on the Grounds of Qualified Immunity [Doc. 33] is granted.


DATED this 29th day of March, 2013.


_____
MARTHA VÁZQUEZ
United States District Court Judge